# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

KEVIN STEPHEN MOHAMMED,           §
                                  §
          *Plaintiff,*            §
                                  §
v.                                §          CIVIL ACTION NO. H-18-1011
                                  §
DEPUTY A. BASKINS, *ET AL.*,      §
                                  §
          *Defendants.*           §

## MEMORANDUM OPINION AND ORDER

Plaintiff, a state inmate at the time of filing, filed this *pro se* section 1983 lawsuit against four employees of the Harris County Constable's Office: Deputy Andrew Baskins, Deputy Justin Loucks, Sergeant Anthony Sebastian, and Deputy Carlos Guerra.[1] Defendants filed a motion for summary judgment (Docket Entries No. 20, 21), to which plaintiff filed a response (Docket Entry No. 23) and defendants filed a reply (Docket Entry No. 24).

Having considered the motion, the response, the reply, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this lawsuit for the reasons shown below.

---

[1]The United States Marshal was unable to serve two other named defendants, Deputy Garza and Deputy Michael Jones, as the deputies could not be located. Plaintiff's claims against a K-9 police dog he named as a defendant were dismissed under prior order, as an animal is not a "person" for purposes of section 1983.

*Background and Claims*

On April 1, 2016, defendants were dispatched to a house owned by plaintiff's parents at 21622 Falvel Sunset Ct., Spring, Texas 77388, to execute fugitive felony arrest warrants against plaintiff. The felony charges included family violence and violation of protective orders. Plaintiff, who was 40 years old and unemployed at the time, had a known history of violent crimes and violent tendencies. A K-9 unit was brought with defendants to the scene, as per Harris County Constable's Office Precinct 4 policy for apprehending violent fugitives.

The deputies arrived at the two-story house and positioned themselves at the front and back doors. Plaintiff's parents and brother answered their door knocks and told the deputies plaintiff was not at home. However, after a few minutes, the father admitted plaintiff was upstairs and called out for plaintiff to surrender.

Plaintiff did not respond. Deputy Baskins entered the house with his K-9 unit and, pursuant to policy, shouted out several warnings to the unseen plaintiff that the K-9 unit would enter the residence, find him, and bite him if he did not reveal himself. Plaintiff again did not respond. Baskins and the K-9 unit proceeded through the house, and the K-9 unit subsequently signaled that plaintiff was behind an upstairs couch.

The parties disagree as to what happened at that point. Baskins, relying on the K-9 dog's signals, states that he again told plaintiff to surrender, and that plaintiff again failed to respond. Baskins moved the couch away from the wall and found plaintiff on the floor hidden under a blanket. Plaintiff refused to show his hands, and Baskins ordered the K-9

unit to apprehend him.  The K-9 unit bit and held on to plaintiff's arm, and plaintiff began fighting him.  Plaintiff resisted the deputies' efforts to arrest and restrain him, but they were eventually able to subdue and handcuff him.

Plaintiff, on the other hand, claims that he was asleep on the upstairs floor and woke up when a dog bit him on the arm.  He argues that he did not fight the dog or resist arrest, but did try to free his arm from the dog's mouth.  According to plaintiff's complaint, the defendants repeatedly struck him for no reason, twisted his arms, and kneed him in the back.

Plaintiff claims in this lawsuit that defendants used excessive force during his arrest, resulting in injuries to his face, neck, and back.  He seeks $2 million in monetary damages.

### *Summary Judgment Standards*

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004).

The court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party.  *Id*.  A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to

3

show that a genuine factual issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012). Although disputed facts are viewed in the light most favorable to a non-movant, the entire record must be considered. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* A plaintiff cannot oppose summary judgment through some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Moreover, a court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008).

### Use of Excessive Force

*Legal Standards*

Claims for use of excessive force in the course of an arrest are analyzed under the Fourth Amendment and its guarantee of freedom from unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989). To succeed on a use of excessive force claim, a plaintiff must establish that he experienced: (1) an injury; (2)

which resulted directly and only from the use of force which was clearly excessive to the need; and (3) the excessiveness of which was clearly unreasonable. *See Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009); *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007). The question is "whether the totality of the circumstances justified" the use of force. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

In *Graham*, the Supreme Court articulated three guideposts for courts to use when determining if a particular use of force was reasonable under the circumstances or excessive to the need. These guidepost are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene. *Id.*, 490 U.S. at 396–97. These factors provide the framework for judging whether an officer's use of force was excessive. *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).

To make out a Fourth Amendment violation, let alone one that violates clearly established law, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation," while evaluating the use of force "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

### *Plaintiff's Written Statement*

Among the exhibits submitted in support of their motion for summary judgment, defendants include an unsworn statement written by plaintiff. The statement is undated,

and no background information for the exhibit is provided.  In the statement, plaintiff

stated in relevant part as follows:

> This is my true and correct statement. On Friday April 1st 2016 at
> approximately 5 pm, I Kevin Mohammed was dropped off at my parents
> house: 21622 Falvel Sunset Ct. Spring TX 77388 by a friend.  Upon
> arriving at my parent['s] house I realized that they were not home so I let
> myself in with my personal house key.  I entered their home and proceeded
> to make myself something quick to eat, before retiring upstairs to the game
> room. The last thing I remember was laying down on the floor of their game
> room and falling to sleep.
>
> when [*sic*] I was awoken abruptly to the bites of a dog that I had never seen.
> coming [*sic*] to and becoming fully cognitive of the fact that there was what
> appeared to be a large Dog [*sic*] whose jaws were firmly clamped around
> my upper left forearm, I reacted by instinctively attempting to break my
> arm free from the dog['s] grasp by pulling my arm back towards me.  At
> that point I then noticed from my sitting position something coming down
> towards me, a bright light the blow of a blunt object that turned out to be
> the officer['s] issued handgun.  The officer then proceeded to continued
> [*sic*] to strike me with said blunt object on my left facial and cranial area.
> As this happened I again became prostrate on the floor as I rolled over on
> my stomach in an attempt to shield my face and head from the blows, while
> the large dog subsequently proceeded to continue to bite me on my buttocks
> and upper thighs on both left and right sides.

(Docket Entry No. 20-9.)

Thus, plaintiff alleges that a single officer struck him with an object and that a dog

bit him.  He does not state that any other officers or individuals were involved.

### *Qualified Immunity*

*Legal Standards*

The doctrine of qualified immunity protects government officials from civil

damages liability when their actions could reasonably have been believed to be legal.

*Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

The qualified immunity inquiry includes two parts. In the first, the court is to ask whether the officer's alleged conduct violated a federal right; in the second, it asks whether the right in question was "clearly established" at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his conduct. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). The officer is entitled to qualified immunity if there is no violation, or if the conduct did not violate law clearly established at the time. *Id.* Once a defendant asserts the qualified immunity defense, the plaintiff bears the burden of negating qualified immunity. *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

"Reasonableness" in Fourth Amendment excessive force claims "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The calculus of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Id.* at 396–97. Ultimately, the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Id.* at 397.

The court must ask whether the law so clearly and unambiguously prohibited the officer's conduct that every reasonable official would understand that what he is doing violates the law. *Id.*; *see also Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc). It is clearly established that criminal suspects have a constitutional right to be free from excessive force during an arrest. *Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir. 2005). This does not end the inquiry, however, as the Supreme Court has carefully admonished that courts are "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted); *see also Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015). Thus, to defeat qualified immunity, a plaintiff must demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Id.* (emphasis added).

In their motion for summary judgment, defendants contend that their use of force did not violate plaintiff's constitutionally guaranteed rights because it was not clearly excessive to the need or objectively unreasonable under the circumstances. They argue

that they are protected under the doctrine of qualified immunity. Plaintiff bears the burden to establish that the defendants are not entitled to qualified immunity. *See Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

*Deputy Loucks*

Plaintiff claims that Deputy Loucks used excessive force by violently twisting his arms behind his back. In an affidavit submitted in support of the motion for summary judgment, Loucks testifies as follows:

> On 4/1/16, I, as well as [defendants Sebastian, Guerra, and Baskins] served a felony warrant at 21622 Falvel Sunset Ct. based on a Crime Stoppers Tip regarding the location of a fugitive. Our precinct uses K-9 units to assist in the apprehension and arrest [of] individuals with violent felony warrants due to officer and public safety concerns.

> We arrived at [the house] at approximately 9:00 PM. Upon arrival at the residence I observed both [Baskins and another deputy] go around to the back yard located to the east of the residence while all the rest of the [deputies] were staged near the front door while [Guerra] knocked on the front door. While attempting to make contact the brother (David Mohammed) of the suspect (Kevin Mohammed) answered the door, and we detained David for further investigation. Shortly after we detained David the father and mother came out trying to find out what was going on. After we informed the father/mother on why we were at their home the father yelled for Kevin to come out so we could take him away. This announcement was given many times by his father in which Kevin disregarded what the father was saying. The father and mother were removed from the home. [Baskins and another deputy] staged at the front door. At this point, we knew that the fugitive we were looking for was hiding in the house.

> [Baskins] announced himself three times "Kevin, Police canine, come out with your hands up or I will release my dog and he will find you and bite you!" but no response was given. After ample time to surrender, and no signs of the suspect verbally or visually [Baskins] commanded Telle his police dog #6325 to search.

9

After a few minutes into the search Kevin was found behind the couch upstairs in the family room. While at the front door I heard [Baskins] yelling quit resisting, quit hitting my dog. I did not see these interactions. After hearing this, [Guerra, Sebastian, and I] ran upstairs to assist on detaining Kevin. During the time of attempting to detain Mohammed he was actively resisting, hitting the department canine, and when I attempted to put handcuffs on him, Mohammed concealed his hands under his midsection refusing to give us his hands. At this time I grabbed his left arm, pulling it as hard as I could in hopes to free it from underneath Mohammed's body. After numerous attempts I was finally able to free his left hand and handcuff the left wrist. Shortly after handcuffing Mohammed's left wrist [Guerra] was also able to free Mohammed's right arm and both wrists at this time were handcuffed securely behind Mohammed's back. After finally getting Kevin detained [Baskins] removed Telle from Kevin's person, and EMS was called to the scene.

EMS arrived on scene and Kevin was transported to Memorial Hermann Hospital for further evaluation and with [another deputy] on board as EMS transported with [Guerra] following.

(Docket Entry No. 20-5, pp. 1–2.)

Plaintiff made no mention of Loucks in his earlier written statement, nor did he state that anyone twisted his arms behind his back during the incident. (Docket Entry No. 20-9.) He further failed to address Loucks's actions in his response to the motion for summary judgment, or controvert Loucks's testimony as to Loucks's conduct during the incident. (Docket Entry No. 23, not submitted under penalty of perjury.) Moreover, plaintiff's medical records regarding his post-arrest medical care did not document any injuries caused by Loucks's actions or any complaints by plaintiff that Loucks's actions injured him.

To the contrary, Loucks's affidavit testimony clearly shows that, when he attempted to handcuff plaintiff, plaintiff concealed his hands under his midsection and

refused to allow his hands to be secured.  As it was necessary that plaintiff be arrested and secured, Loucks grabbed his arm and pulled it in an attempt to free it from underneath plaintiff's body.  After numerous attempts, Loucks was finally able to free plaintiff's left hand and apply restraints to his left wrist.  That Loucks had to pull plaintiff's arm "as hard as I could in hopes to free it" indicates that plaintiff was actively resisting Loucks's efforts to apply hand restraints.

The summary judgment evidence shows that Loucks used that degree of force reasonably necessary to restrain plaintiff for purposes of completing his arrest, and plaintiff presents no probative summary judgment evidence to the contrary.  Plaintiff fails to show that Loucks's use of force in arresting and restraining him was objectively unreasonable or clearly excessive.  Loucks is entitled to qualified immunity and summary judgment dismissal of plaintiff's Fourth Amendment claims against him.

### Deputy Guerra

Plaintiff claims that Deputy Guerra violently twisted his left and right arm and hog tied him then lifted him and carried him out of the house, causing harm to his arms and shoulders.

Guerra submitted an affidavit in support of the motion for summary judgment, wherein he testifies as follows:

> On Friday, April 1, 2016, I . . . was asked to go to 21622 Falvel Sunset Ct. in reference to a felony warrant service.  Upon my arrival, [Sebastian] told me that he was contacted by the "Crime Stoppers" in reference to a fugitive at the location above. He told me that the description of the suspect was an Indian male wearing a white shirt and cargo shorts.  I observed a Texas

Driver's license photo of the suspect from [Sebastian]. I learned that the suspect was identified as Kevin S. Muhammed [*sic*]. I was also told by [Sebastian] that Kevin was wanted through Harris County, as well as Fort Bend County Sheriff's Office for felony offenses. As we were attempting to apprehend a fugitive wanted for violent crimes, it is our precinct's policy to have K-9 units assisting if possible due to officer and public safety concerns.

I arrived to the location in my marked Precinct 4 police vehicle and was in full uniform. At the location I saw the K-9 officers, [Baskins, and another deputy] go around to the back of the residence. [Sebastian] and I rang the doorbell and knocked on the front door. I saw that there was a male sitting on the couch through the front door window. At first the male seemed to ignore the ringing of the doorbell and the knocking so I used the light from my flashlight to get his attention and he came to the door and opened it. I asked him if he was Kevin and he responded "no." At that point a woman came to the front door and refused to step outside, so I called for the K-9 units to come to the front to assist with entry while I repositioned myself at the rear of the house to prevent the fugitive from escaping through that exit.

I did not see the K-9 team enter the residence, but [could] hear them calling out for the male and also stated who they were and that he could get bit if he did not surrender.

While in the back of the residence, I could see through a window on the second floor. I then heard the K-9 units yelling "stop resisting." I ran towards the front of the house and went upstairs to the location of where the K-9s were. I saw the fugitive Kevin Mohammed, who I recognized from his driver's license photo, resisting arrest by moving his arms in a violent manner and fighting with the deputies and with the K-9 Unit. Mohammed was then detained by [Baskins] who used Precinct 4 procedures and force necessary to subdue a person resisting arrest such as Mohammed. Specifically, Mohammed was lying face down while [Sebastian] placed his knee on Mohammed's back while he secured Mohammed's hands with handcuffs. I then assisted with bringing Kevin downstairs from the second floor to the outside of the residence. At no time were Mohammed's feet or ankles restrained. I placed Mohammed outside the residence on the ground, where he was sitting up. Deputy Gaza, who was a new deputy still in training, remained outside the residence and did not interact with the suspect until he was secure.

Pursuant to Precinct 4 policy, EMS was then called to the scene to treat any potential injuries that occurred in apprehension of Mohammed through the use of the K-9. EMS 56 from Cy-Creek arrived and transferred Mohammed to the hospital. Deputy Gaza rode with EMS to Memorial Hermann in the Woodlands while I drove separately in my police vehicle. I stayed with Mohammed until he was released from the hospital where I then transferred Mohammed to the Harris County Jail. Mohammed also had a Fort Bend out of county warrant. Mohammed was then booked into the Harris County jail on two other warrants from [the] Harris County Sheriff's [O]ffice. I then left Mohammed in jail staff custody in good health.

(Docket Entry No. 20-7, pp. 1–2.)

Plaintiff made no mention of Guerra in his earlier statement, nor did he state what actions Guerra took that constituted excessive force during the incident. (Docket Entry No. 20-9.) He further fails to address Guerra in his response to the motion for summary judgment, or controvert Guerra's testimony as to Guerra's conduct during the incident. (Docket Entry No. 23, not submitted under penalty of perjury.) Moreover, plaintiff's medical records regarding his post-arrest medical care did not document any injuries caused by Guerra's actions or any complaints by plaintiff that his actions injured him.

To the contrary, Guerra's affidavit testimony shows that Guerra had limited involvement in the arrest and securing of plaintiff. He states that he "assisted with bringing Kevin downstairs from the second floor to the outside of the residence" and that plaintiff's feet and ankles were never restrained. Guerra placed plaintiff "outside the residence on the ground, where he was sitting up." There is no probative summary judgment evidence that Guerra "hog tied" plaintiff, and nothing in the medical records

shows that plaintiff sustained any injuries consistent with being hogtied or that he complained of any such injuries to EMS or medical personnel.

The summary judgment evidence clearly shows that Guerra did not use any force, let alone excessive force, in the arrest and restraining of plaintiff, and plaintiff presents no probative summary judgment evidence to the contrary. If Guerra did use any force, plaintiff fails to show that Guerra's use of force in arresting and restraining him was objectively unreasonable or clearly excessive. Guerra is entitled to qualified immunity and summary judgment dismissal of plaintiff's Fourth Amendment claims against him.

*Sergeant Sebastian*

Plaintiff claims that Sergeant Sebastian violently held him down to the ground with a knee behind the neck area causing neck injury.

Sebastian submitted an affidavit in support of the motion for summary judgment, wherein he testifies as follows:

> I . . . was advised by [another sergeant] of a lead from Crime Stoppers on a suspect (Kevin S. Muhammed [*sic*] 11/21/75) who was currently wanted on a felony warrant for 'REPEATED VIOLATION OF A PROTECTIVE ORDER, FELONY 3." He also told me that the suspect is currently staying at 21611 [*sic*] Falvel Sunset Ct.

> With this information, I contacted K9 unit [Baskins] and K9 unit [Deputy Jones]. I also had several other deputies make the scene to assist with the apprehension of the suspect. I was the supervisor for this operation. Whenever our department attempts to apprehend a violent fugitive, we utilize K9 units for officer and public safety.

> Upon arrival at the residence, myself along with [Loucks, Guerra, and Garza] positioned ourselves at the front entrance of the residence and

knocked on the front door while both K9 units made entry into the back yard. We take these positions to prevent suspects from fleeing.

A male came to the front door and opened it, at which point I grabbed him and handed him off to [Loucks] who then detained the male. Based upon the suspect's driver's license, we knew that this was not the suspect, however we were able to confirm we were at the correct location. At this time both K9 units came to the front of the residence while [Guerra and Garza] re-positioned themselves in the back yard. While trying to enter the residence, [an] older male and older female came to the front door and saying that they were Kevin's parents. The father stated that Kevin was upstairs. [Another deputy and I] then escorted Kevin's parents out front while the K9 unit entered the residence.

While standing outside with the other deputies, I heard both K9 officers yelling from the upstairs area, "stop resisting," "stop fighting." I did not see the initial interactions between the suspect and the K9 or K9 officers. At this time, I entered the residence and ran upstairs where I observed the suspect fighting with the deputies and canine dog. [Baskins] ordered the dog away from the suspect and we began to arrest the suspect. He refused to comply and continued resisting by struggling with the officers and would not allow us to place him in handcuffs/hand restraints. I then assisted by holding down the suspect while the other deputies placed hand restraints/handcuffs on him. Pursuant to police and precinct policy, I placed my knee on the suspect's back in order to restrain him. I placed my knee in a position that may cause discomfort to the detainee but will not cause permanent injuries. Loucks and Guerra also assisted in the detention and handcuffing of the suspect. Garza, who was a police trainee at the time, remained outside with the parents and brother of the suspect and did not engage with the suspect until the area was secure.

Once the suspect was taken into custody, Deputies then escorted him down the stairs and outside where he was looked at by EMS and placed in the back of an ambulance to be transported to the hospital for his bites. Neither Deputy Guerra nor Deputy Garza, or any other Deputy on the scene restrained the suspect by hog tying his hands and legs behind his back. The suspect was simply taken into custody with hand restraints/handcuffs, which were secured on his wrists and behind his back.

> I then followed EMS to Memorial Hermann The Woodlands where I used my department issued camera to take pictures of the suspect's dog bites/wounds.   I uploaded all photos to the Incident Report.

(Docket Entry No. 20-6, pp. 1–2, original capitalizations.)

Plaintiff made no mention of Sebastian in his earlier statement, nor did he state that anyone violently held him down to the ground with a knee behind his neck.  (Docket Entry No. 20-9.)  He further fails to address Sebastian in his response to the motion for summary judgment, or controvert Sebastian's testimony as to Sebastian's conduct during the incident.  (Docket Entry No. 23, not submitted under penalty of perjury.)  Moreover, plaintiff's medical records regarding his post-arrest medical care did not document any injuries caused by Sebastian's actions or any complaints by plaintiff that Sebastian's actions injured him.

To the contrary, Sebastian testified in his affidavit that plaintiff had refused to comply and continued resisting by struggling with the deputies and would not allow them to handcuff him.  Sebastian states that he then assisted by holding plaintiff down while the other deputies handcuffed him and that he followed policy by placing his knee on plaintiff's back to restrain him.  Sebastian added that, although the position could cause a suspect discomfort, it would not cause permanent injuries.

The summary judgment evidence shows that Sebastian used that degree of force reasonably necessary to apprehend and restrain plaintiff, and plaintiff presents no probative summary judgment evidence to the contrary.  Plaintiff fails to show that Sebastian's use of force in arresting and restraining him was objectively unreasonable or

clearly excessive. Sebastian is entitled to qualified immunity and summary judgment dismissal of plaintiff's Fourth Amendment claims against him.

*Deputy Baskins*

Plaintiff complains that Deputy Baskins intentionally struck him in the head with a blunt object. His pleadings, afforded the required liberal construction, also claim that Baskins's use of the K-9 dog constituted excessive force.

Baskins submitted an affidavit in support of the motion for summary judgment, wherein he testifies as follows:

> On Friday, April 1, 2017, I . . . went to 21622 Falvel Sunset Ct., Spring, Harris County, Texas, at approximately 20:38 hours in reference to a warrant service. I was accompanied by my K-9 partner, Telle. We traveled in a marked police vehicle and I was in full police uniform. Upon arrival, [Sebastian] advised he was contacted by the "Crime Stoppers" in reference to a fugitive [at the above location]. He advised that the description of the suspect was an Indian male wearing a white shirt and cargo pants. I observed a Texas Driver's license photo of the suspect from Sgt. Sebastian. I learned that the suspect was identified as Kevin S. Mohammed[.] I was also advised by Sgt. Sebastian that the suspect was wanted through Harris County, as well as Fort Bend County Sheriff's Office for felony offenses. The suspect was alleged to have violent tendencies. Police service animals assist police officers in criminal apprehension by providing a safer alternative to clearing unknown areas or searching for concealed or hidden fugitives.
>
> Telle is certified by the National Narcotic Detector Dog Association as police service dog #6325. More specifically, Telle is trained in the detection of specific illegal narcotics and criminal apprehension. I secured Telle in a patrol harness clearly marked with reflective "Police" panels. In accordance with procedures, I attached Telle to a fifteen foot lead, which allowed me to control Telle while at the same time providing enough length for him to search a house. This allows me to have control over my canine while providing distance between a violent offender and increases reaction times for me in the event of an ambush. Furthermore, it allows the handler

to send the canine into areas with no visibility preventing officers from entering a fatal funnel [*sic*].

I led Telle to the rear of the residence to cover all rear points of exit at the residence. Sgt. Sebastian made contact with the homeowners at the front door and confirmed that we had the correct address. I was advised that the homeowner, Kevin Mohammed's father, stated that no one other than his wife was inside the residence. According to Sgt. Sebastian, she was standing near the front door and was removed by other officers. The homeowner was standing in the doorway delaying the execution of the warrant. Deputy Jones removed the homeowner from the door way for officer safety. The delay in execution of a warrant after arrival to a house is of concern to police officers as it allows the potentially armed fugitive to have a vantage point to ambush officers in the door way. In this case, the fugitive Mohammed had warrants for two separate violent felonies and we proceeded according to policies implemented to reduce safety risks to the homeowners and the officers.

I then moved to the front entryway of the residence. I asked the homeowner if there was anyone inside the residence and again he stated that there was not. Due to the Crime Stopper's tip and the relationship between the owner of the house and the suspect, I believed the homeowner was lying and in accordance with my training, gave three loud and clear canine warnings into the residence. The warnings were as follows: "Kevin, Police Canine, come out with your hands up or I will release my dog and he will find and bite you!" I give these warnings in order to provide suspects the opportunity to surrender without using the K-9. We prefer to give suspects every opportunity to surrender before using the K-9s. They are only used as a last resort as I only want the dog to detain suspects who are a threat to officer or public safety. In this case, a house at night with a fugitive on two violent felony warrants, law enforcement officers have no idea if the suspect has weapons or otherwise poses a risk to the officers, himself, or others. Therefore the K-9 unit is used as a means to quickly locate and detain the suspect while limiting human danger.

Approximately 35 to 45 seconds after I gave the K-9 warnings, we entered the residence. This is the typical amount of time we give fugitives before making entry in order to provide officers the time to secure the residence in case a violent fugitive is creating an ambush for officers entering the area. Upon entry into the home, there were no signs of the suspect verbally or visually, therefore I commanded Telle to search for Mohammed. Telle

entered the residence and I followed. As I began my search I heard the homeowner call out "Kevin just come out." Based upon this acknowledgment by the homeowner, I knew that [Mohammed] was hiding in the house in an attempt to avoid capture or possibly ambush the officers. K-9 Telle pulled me through the living area of the residence into a stairway leading to the second floor. I observed Telle pull right at the top of the stairway into a dark room with no lighting. I observed this room to be a game/living area with multiple couches, tables, a desk, and a closet. I observed Telle show a change of behavior by high heading which is his way of indicating that the suspect was in the immediate area. I called Telle to me, and once again loudly made a canine announcement as follows, "Kevin. Police canine, come out with your hands up or I will release my dog and he will find and bite you!"

After providing the warning and allowing more time to surrender, there was no sign or sound of the fugitive. I commanded Telle to search. Telle pulled to the corner of the room and started pacing in front of the couch angled at the corner. Based on Telle's actions and the orientation of the couch, I suspected that Mohammed was hiding behind the couch. Therefore, I began to give commands to the suspect to surrender with his hands up. The suspect did not acknowledge the warnings, therefore due to officer safety concerns I commanded Telle to search behind the couch.

At this point, the couch was moved away from the wall. I observed the suspect lying under a blanket in the corner of the wall. I gave multiple commands for the suspect to come out and show his hands. The suspect refused to comply therefore out of concern for officer safety, I commanded Telle to apprehend the suspect. Telle apprehended the suspect via a bite and hold to the suspect's left arm. At this time, I was able to confirm visually that this was the fugitive with open warrants.

Mohammed became violent and began striking my canine partner with a closed fist. The suspect then began choking my canine which caused Telle to release his hold. I began to attempt to detain the suspect and he made several attempt[s] to strike me with a closed fist. Due to Mohammed's violent behavior and continued refusal to comply, I ordered my canine to apprehend the suspect once again and he made contact with the suspect's right hip area. At this point the suspect began reaching under his body. As the area was not yet secure and there was poor lighting, I was concerned that Mohammed was reaching for a weapon. I again gave Mohammed multiple verbal commands to show his hands and he refused. While

attempting to pull the suspect's hand from under him I observed an unknown black object in his right hand. As I was concerned for my safety as well as the K-9 unit's, I used reasonable and necessary force consisting of several closed fists to cause the suspect to drop the object, later determined to be a black cell phone. Mohammed then began to comply with my orders and with assistance from Deputy Jones and Sgt. Sebastian, the suspect was handcuffed. Mohammed was taken into custody and secured in wrist restraints and taken down the stairs to be transported to the hospital.

I then returned to my patrol vehicle and secured K-9 Telle in my vehicle. I radioed Dispatch and requested EMS to the scene to treat the suspect's injuries. Pursuant to policy and training, any time a canine is utilized to apprehend a suspect EMS is immediately dispatched to treat the suspect for any injuries. The suspect was checked for injuries at which time he was found to have punctures/lacerations to his left forearm, and right hip. Sgt. Sebastian photographed the suspect's injuries after being transported to the Memorial Hermann Woodlands. The suspect was identified as Kevin Muhammed [*sic*] with a date of birth of 11/21/75.

(Docket Entry No. 20-4, pp. 1–3.)

Because this case concerns the defense of qualified immunity, "the Court considers only the facts that were knowable to the defendant officers." *White v. Pauly*, __U.S. ____, 137 S. Ct. 548, 550 (2017) (per curiam); *Kingsley v. Hendrickson*, ___U.S.____, 135 S. Ct. 2466, 2474 (2015) (emphasizing that "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"). "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, ___U.S.____, 137 S. Ct. 2003, 2007 (2017) (per curiam). An officer's actions are to be evaluated in light of the circumstances that confronted him, without the benefit of hindsight. *Graham*, 490 U.S. at 396–97.

Plaintiff's excessive force claim against Baskins is two-fold: Baskins acted unreasonably in striking him and in prompting the K-9 to bite him. At the time of the challenged conduct, neither the United States Supreme Court nor the Fifth Circuit Court of Appeals had addressed what constitutes reasonable use of K-9 force during an arrest. Under *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), the law is now clearly established that when "[n]o reasonable officer could conclude that [a suspect] pose[s] an immediate threat to [law enforcement officers] or others," it is unreasonable to use K9 force to subdue a suspect who is complying with officer instructions. However, *Cooper* was decided on December 27, 2016; thus, at the time of this incident on April 1, 2016, it cannot define clearly established law for this case. *See Shumpert v. City of Tupelo*, 905 F.3d 310, 321–22 (5th Cir. 2018).

Even assuming *Cooper* were the law at the time, plaintiff fails to show that Baskins's use of force was unreasonable under the facts of this case. Plaintiff, as mentioned earlier, alleges in his written statement and summary judgment response that he was asleep on the floor and that he tried moving his arm away from the K-9 dog to loosen the bite. Significantly, plaintiff does *not* present probative summary judgment evidence controverting Baskins's testimony that he was hidden under a blanket on the floor (whether asleep or not), that he choked the K-9 dog, that he moved his hands to where they could not be seen and refused to show them, causing Baskins to fear that he had a weapon, and that he was holding a black object when Baskins pulled his hands away. Moreover, because plaintiff claims that he was asleep on the floor, he does not

dispute Baskins's testimony that plaintiff failed to respond to his warning shouts and orders to surrender before he utilized the K-9 unit.

Baskins testifies that he knew plaintiff was hiding in the house, because the father had yelled out to plaintiff to surrender. In light of the father's shout, Baskins could reasonably infer that plaintiff was nearby, attempting to avoid capture or possibly ambush the officers. Given that plaintiff did not respond or surrender, it became necessary for Baskins to search the house. For his own and the family's safety, Baskins used his K-9 unit to help search for the fugitive. Baskins continued shouting out for plaintiff to surrender and warning him of the K-9's presence, but no response was forthcoming. That plaintiff claims he was asleep on the floor is of no import; from Baskins's viewpoint, plaintiff was a violent fugitive who was somewhere in the house, within hearing distance of the father's voice, and not responding, which presented a safety risk to the officers and public.

Plaintiff states that he was asleep on the floor, but does not deny he was under a blanket or behind a sofa. Baskins testified in his affidavit that, "[i]n this case, a house at night with a fugitive on two violent felony warrants, law enforcement officers have no idea if the suspect has weapons or otherwise poses a risk to the officers, himself, or others. Therefore the K-9 unit is used as a means to quickly locate and detain the suspect while limiting human danger."

When Baskins and the K-9 unit reached the room where plaintiff was located, the K-9 unit alerted Baskins to plaintiff's presence. Plaintiff does not dispute that Baskins

found him under a blanket on the floor.  Because he claims he was asleep, he does not dispute Baskins's testimony that he shouted for plaintiff to show his hands and surrender or that he warned him of the K-9.  For the same reason, he does not controvert Baskins's testimony that he failed to surrender or respond, and that, for officer and public safety, it was reasonable for Baskins to order the K-9 to apprehend him.

Moreover, plaintiff does not controvert Baskins's testimony that plaintiff began choking the K-9 dog, which caused the dog to release plaintiff's arm. According to Baskins, plaintiff continued refusing to surrender and Baskins ordered the K-9 unit to again apprehend him, but plaintiff began reaching under his body.  Baskins was concerned that plaintiff was reaching for a weapon.  He ordered plaintiff to show his hands, but plaintiff refused.  When Baskins attempted to pull plaintiff's hands from under him, he saw that plaintiff was holding an unknown black object.  Baskins used reasonable and necessary force in striking plaintiff and causing him to drop the object.  The object was later found to be a black cell phone.  Plaintiff subsequently complied with Baskins's orders and was handcuffed.

Under the totality of these circumstances, Baskins's use of force was not objectively unreasonable or clearly excessive.  Plaintiff fails to show that Baskins's use of force in arresting and restraining him was objectively unreasonable or clearly excessive. Baskins is entitled to qualified immunity and summary judgment dismissal of plaintiff's Fourth Amendment claims against him.

*Conclusion*

Defendants' motion for summary judgment (Docket Entry No. 20) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE. Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on September 17, 2019.

_____
Gray H. Miller
Senior United States District Judge